UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

- - - - - - - - - - - - - - - - - - -
RALPH BELLO AND VERA ASSOCIATES    :
LIMITED PARTNERSHIP,
                                   :
            Plaintiffs,            :
                                   :
        v                          :    3:01cv01531 (AWT)
                                   :
BARDEN CORPORATION,                :
                                   :
            Defendant.             :
- - - - - - - - - - - - - - - - - - -

**RULING ON MOTION FOR SANCTIONS**

Defendant Barden Corporation ("Barden"), together with Mattatuck Industrial Scrap Metal, Inc. ("Mattatuck"), Winsted Precision Ball Company, Inc. ("Winsted"), and Howard Engineering Company ("Howard"), all represented by the law firm of Carmody and Torrance, mounted a joint defense to certain claims brought by the plaintiffs, Ralph Bello ("Bello") and Vera Associates Limited Partnership ("Vera Associates") in this action and three related cases filed in this court. Barden has moved for sanctions against Bello and Vera Associates and their counsel. For the reasons set forth below, Barden's motion is being granted.

I.  **Factual Background**

The plaintiffs are the owners of property located at 16-20 Elm Street in West Haven, Connecticut. Between January 9, 1984 and October 31, 1997, the plaintiffs rented this property to Robert Pattison, Sr. and certain corporations owned and/or

controlled by him (collectively, "National Oil Services").
National Oil Services operated a waste oil storage, treatment,
transfer, recycling and disposal facility at the property
throughout that time.

During the same period, National Oil Services obtained waste
oil from numerous companies, including Barden, Mattatuck,
Winsted, and Howard.  On or about January 8, 1998, there was a
spill of hazardous substances that had been stored on the
property.

The United States Environmental Protection Agency ("EPA")
conducted a cleanup of the property between January 8, 1998 and
June 30, 1998, at a cost in excess of $1,134,000.  The EPA
initiated proceedings under the Comprehensive Environmental
Response, Compensation and Liability Act of 1980, 42 U.S.C.
§§ 9601 et seq., as amended, ("CERCLA") to recover the costs it
incurred in cleaning up the property.  On October 1, 1998, the
EPA placed a lien on the plaintiffs' property in the amount of
$1,134,000.

In or about December of 2000, the plaintiffs filed seven
complaints against approximately 59 defendants in Connecticut
Superior Court, asserting claims for damages the plaintiffs
purportedly incurred as a result of the 1998 EPA cleanup of the
property.  Originally, each of the complaints was a one-count
complaint sounding in negligence.  The damages sought by the

2

plaintiffs were as follows: (i) amounts to pay for release of the
EPA lien in the amount of $1,134,000; (ii) property damage in the
aggregate amount of $160,105.60; (iii) lost rents in the amount
of $360,000; and (iv) undisclosed lost profits from two failed
sales of the property.

On March 19, 2001, Palladin Precision Products, Inc.
("Palladin"), Mattatuck and Winsted (the "Palladin Group") filed
a request that the plaintiffs revise their state court complaint
naming them as defendants (the "Original Palladin Complaint") in
12 different respects.  The Eleventh Request to Revise
specifically asked the plaintiffs to identify the duty that those
defendants purportedly owed the plaintiffs with regard to
National Oil Services' management of waste materials at the
plaintiffs' property.

On or about March 27, 2001, the plaintiffs requested leave
to file an amended complaint as to the Palladin Group (the
"Amended Palladin Complaint").  The proposed Amended Palladin
Complaint contained three counts pursuant to which the plaintiffs
sought the same recovery sought in the Original Palladin
Complaint.  The First Count in the proposed Amended Palladin
Complaint alleged common law negligence, but it failed to allege
any duty of care that any of the defendants in the Palladin Group
owed the plaintiffs with regard to the management of waste
materials at the property.  The Second Count in the proposed

3

Amended Palladin Complaint was brought under Sections 107 and 113 of CERCLA. The Third Count in the proposed Amended Palladin Complaint alleged common law intentional and/or reckless conduct, but it also failed to allege any duty of care that any of the defendants in the Palladin Group owed the plaintiffs with regard to the management of waste materials at the property.

In April of 2001, the Palladin Group objected to the plaintiffs' request for leave to file the Amended Palladin Complaint on the ground that the plaintiffs had failed to respond to the pending requests to revise. The Palladin Group also objected to the CERCLA claim the plaintiffs sought to bring in the proposed Amended Paladin Complaint on the ground that the Connecticut Superior Court did not have subject matter jurisdiction over that claim.

During May 2001, plaintiffs' counsel made settlement offers to Palladin, Mattatuck, Winsted, BMI and Royal Screw Machine as to his clients' pending state claims. The plaintiffs' state court settlement offers were as follows: Palladin ($4,500), Mattatuck ($6,981), Winsted ($14,269.90), Royal Screw Machine ($5,000) and BMI ($1,000). The plaintiffs' counsel also made a settlement offer to Barden in the amount of $58,766.80 even though the plaintiffs had not filed an action against Barden in Superior Court. The plaintiffs' counsel was able to induce some defendants to settle his clients' negligence claims, which were

4

identical to the negligence claims that had been brought in the Original Palladin Complaint.

The plaintiffs's seven state court complaints were transferred to the Connecticut Superior Court's complex litigation docket, where a motion was made to consolidate the seven actions.  On June 29, 2001, the plaintiffs filed a revised complaint against the Palladin Group (the "Revised Palladin Complaint"), in which they asserted a single negligence claim against each of the seven defendants named therein in a separate count for each defendant, including Palladin, Mattatuck and Winsted.

A hearing on the plaintiffs' request for leave to file the Amended Palladin Complaint and several motions by the defendants for nonsuit was held on June 29, 2001.  At the time of the June 29, 2001 hearing, the Original Palladin Complaint, the plaintiffs' motion for leave to file the Amended Palladin Complaint, and the Revised Palladin Complaint were all pending before the Superior Court.  The Superior Court denied the plaintiffs' request for leave to amend their complaints because the revised complaints filed by the plaintiffs were not responsive to the pending requests to revise.  The Superior Court entered a nonsuit as to the plaintiffs' claims as to each defendant who had filed a request to revise.  The nonsuit was a final judgment pursuant to which the plaintiffs had four months

to move to reopen their case.  The Superior Court thereafter
issued written orders entering nonsuit as to 30 defendants who
had filed requests to revise, including Palladin, Mattatuck and
Winsted.

On July 31, 2001, the plaintiffs filed a complaint in this
court naming a single defendant.  See Bello v. Warner Lambert
Co., Docket No. 3:01CV01436.  Thereafter, on August 14, 2001, the
plaintiffs filed 23 complaints in this court, each of which also
named only a single defendant.  Barden and Winsted were named in
complaints filed on August 14, 2001.  The claims against Barden
and Winsted were identical.

The First Count of the plaintiffs' federal court complaint
against Barden was brought under CERCLA, 42 U.S.C. §§ 9607 and
9613.  The Second Count asserted a state law claim for
"intentional and/or reckless" conduct.  In their complaint, the
plaintiffs sought the following amounts as damages for the
following injuries or losses: (i) $125,910 for damage to an Abcor
system; (ii) $34,195.60 for damage to oil tanks; (iii) $420,000
as damages for loss of rental income; (iv) an unspecified amount
as damages in connection with two failed attempts to sell the
property for $1,750,000; (v) $2,680 as damages for costs to be
incurred in the future in connection with the cleanup of debris
left on the property at the end of the EPA cleanup; (vi) $12,000
as damages for costs to be incurred in the future in connection

with testing the pressure in the oil tanks; and (vii) $1,150 as damages for investigatory costs incurred to determine the extent of hazardous materials on the property.

The EPA filed two lawsuits in this court to recover costs the EPA incurred to perform the cleanup of the plaintiffs' property.  On August 17, 2001, the EPA sued, <u>inter alia</u>, Bello and Vera Associates to recover those cleanup costs.

Also on August 17, 2001, the EPA commenced an action against Barden and some 400 other parties that had disposed of or arranged for the disposal of hazardous substances at the property through National Oil Services, seeking to recover its response costs under CERCLA.  Many of the defendants in that action, including Barden, Winsted, Howard and Mattatuck, promptly accepted the EPA's settlement offer and agreed to pay their share of the agency's response costs.  On September 14, 2001, a consent decree (the "Consent Decree") memorializing the settlement was lodged with the court.  <u>See United States of America v. A-1 Auto Service, Inc. et al.</u>, Docket no. 3:01CV01567 (AHN) (D. Conn.). Notice of the Consent Decree was published in the Federal Register on October 4, 2001, and on December 19, 2001, the EPA filed a motion to enter the consent decree.

Paragraph 20 of the Consent Decree states, in relevant part, that:

> The Parties agree, and by entering this
> Consent Decree this Court finds, that Settling

7

> Defendants and the Settling Federal Agencies
> are entitled, as of the Effective Date of this
> Consent Decree, to protection from
> contribution actions or claims as provided by
> Section 113(f)(2) of CERCLA, 42 U.S.C. §
> 9613(f)(2), for "matters addressed" in this
> Consent Decree.  The "matters addressed" in
> this Consent Decree are Past Response Costs.

(Doc. 16, Ex. C at 7.)  The definitions section of the Consent

Decree provides that "Past Response Costs" shall mean "all costs,

including but not limited to direct and indirect costs, that EPA

or DOJ on behalf of EPA has paid at or in connection with the

site through May 15, 2001, plus accrued Interest on all such

costs through such date."  Id. at 2.

Thus, it was clear that once the Consent Decree was entered,

Barden and the other "Settling Defendants" would have protection,

pursuant to CERCLA § 113(f)(2), from contribution for matters

addressed in the settlement.

On or about August 29, 2001, after the EPA had commenced its

two actions in this court but before the lodging of the Consent

Decree, the plaintiffs filed nine additional complaints in this

court, naming a total of 41 additional defendants, including

Howard and Mattatuck.  The claims against Howard and Mattatuck

were identical to the plaintiffs' claims against Barden and

Winsted.  In addition, the plaintiffs' CERCLA and common law

intentional/reckless conduct claims in their federal complaints

against Barden, Winsted, Howard and Mattatuck were identical to

the plaintiffs' CERCLA and common law intentional/reckless

8

conduct claims in the Amended Palladin Complaint, which had been filed against Mattatuck and Winsted.  The law firm of Carmody and Torrance filed separate appearances in this court on behalf of each of Barden and Winsted on September 13, 2001 and on behalf of each of Howard and Mattatuck on October 11, 2001.

On or around October 12, 2001, the plaintiffs filed four additional complaints in this court, naming an additional 18 defendants.  The number of defendants named by the plaintiffs in related lawsuits filed in this court totaled 83.  The claims were in all material respects identical.

On October 19, 2001, the court held a joint status conference in approximately 34 cases filed by the plaintiffs.  In almost every instance, the defendant or defendants in the case were represented at the status conference by counsel.  Six of the defendants, including Barden, Winsted and Mattatuck, had filed motions to dismiss.  The court decided to select and address first one motion to dismiss, as a method for resolving issues that would dispose of all issues raised in the motions to dismiss that had been filed or were expected to be filed by other defendants.  The court selected for this purpose the motion to dismiss that had been filed by Barden.

On October 24, 2001, the court had a conference with plaintiffs' counsel and counsel for Barden to discuss Barden's pending motion to dismiss.  During that conference, there was a

discussion of Barden's arguments for dismissal of the plaintiffs' claims, and plaintiffs' counsel indicated there might be additional claims under CERCLA that had not been included in the complaint.  Plaintiffs' counsel was ordered to identify in the plaintiffs' opposition memorandum any other CERCLA claim the plaintiffs might have, in order to avoid repeated rounds of amended pleadings followed by additional motions to dismiss.

When the plaintiffs filed their opposition to Barden's motion to dismiss on November 9, 2001, they identified one additional claim under CERCLA, which was a claim for water usage fees in the aggregate amount of $900.37.

On or about October 26, 2001, plaintiffs' counsel extended settlement offers with regard to the plaintiffs' federal claims as follows: Barden ($49,951.78), Winsted ($12,129.42), Howard ($5,625.81) and Mattatuck ($5,358.40).  The plaintiffs' written settlement offers advised Barden, Winsted, Howard and Mattatuck that they were being asked to settle the plaintiffs' claims against them for the same amount they had paid to settle the EPA's claims against them.  As of October 26, 2001, plaintiffs' counsel was aware or should have been aware that Barden, Winsted, Howard and Mattatuck would be entitled to contribution protection under CERCLA once their settlements with the EPA were approved by the court.

In ruling on Barden's motion to dismiss, the court dismissed all the plaintiffs' claims with prejudice because they failed to state a claim for which relief could be granted, but granted the plaintiffs' leave to amend the complaint to include the claim for recovery of $900.37 for water usage fees, which had not been included in the complaint. The court's ruling spelled out in detail the reasons why the plaintiffs' claims should be dismissed with prejudice. The ruling noted that the plaintiffs set forth two claims in the First Count, the first claim being one brought under CERCLA § 107(a), i.e., 42 U.S.C. § 9607(a), and the second being a claim for contribution brought under CERCLA § 113(f)(1), i.e., 42 U.S.C. § 9613(f)(1). As to the first claim under CERCLA, the ruling directed the plaintiffs to authority standing for the proposition that as owners of the property where the release of hazardous materials occurred, the plaintiffs were potentially responsible parties under CERCLA and a potentially responsible party may not bring suit under CERCLA § 107(a). As to the second CERCLA claim, i.e., the claim for contribution, the ruling directed the plaintiffs to authority for the proposition that a private party cannot recover under CERCLA for property damage resulting from a release of hazardous substances, nor for economic losses suffered as a consequence of such a release. As to the claim for investigatory costs, the ruling noted that such

costs are recoverable under CERCLA only if they conform to the
national contingency plan and also noted that:

> The plaintiffs have not alleged that such
> investigatory costs conform to the national
> contingency plan, nor have they indicated in
> their opposition to the motion to dismiss that
> they contend that such costs, in fact, conform
> to that plan.  This is so notwithstanding the
> fact that a prominently featured argument in
> support of the motion to dismiss is that the
> plaintiffs failed to allege that the work
> related to these costs was performed "in a
> manner consistent with" the national
> contingency plan.

(Ruling on Mot. to Dismiss (Doc. No. 21) at 16-17.)

As to the Second Count, the ruling pointed out that the
claim was barred by the applicable statute of limitations and
also that the plaintiffs had failed to allege the requisite
elements of the claim.  Significantly, the ruling stated that the
plaintiffs had failed to allege any facts that would support a
finding that Barden owed them any duty of care.  (See id. at 24.)

On or about the day the court dismissed the plaintiffs'
complaint against Barden, the court dismissed the plaintiffs'
claims against the remaining defendants in the related lawsuits
pending in this court.  The orders dismissing those other claims
incorporated by reference the court's analysis in its ruling on
Barden's motion to dismiss.

On January 16, 2002, the court held a joint status
conference in this case and approximately 22 related cases.
Representatives of approximately 18 different law firms were

12

present to represent approximately 30 defendants.  At the beginning of the status conference the court noted that it was going to first inquire of plaintiffs' counsel as to how he intended to proceed in light of the rulings that had been issued on the motions to dismiss in several of the cases.  When the court asked plaintiffs' counsel whether he was going to file a motion for reconsideration, plaintiffs' counsel replied that doing so was an option that was being considered "very seriously."  (Tr. of Beginning of 1/16/05 Status Conference (Doc. No. 38) at 1, 7.)  The court inquired whether there was any reason for filing a motion for reconsideration other than the fact that the plaintiffs wished the ruling had been different.  Plaintiffs' counsel responded as follows: "I will say – I'll go along with what you stated.  I have all the reasons.  I'm still exploring and looking into them to see how that would fit into the Motion to Reconsider." (<u>Id.</u> at 7, l. 12-15.)  The court then noted that any motion for reconsideration would have to be filed by January 22, 2002.  (<u>See</u> <u>id.</u>)  No motion for reconsideration was ever filed.

Also, the court noted that in one case a motion for sanctions had been filed.  (<u>See</u> <u>id.</u> at 5.)

Then just before the court met at the sidebar with counsel in each of the individual cases, Barden's counsel stated the following:

> Your Honor, if I may, it's our understanding that the
> sole claim remaining for the plaintiff is one for water
> fees in the amount of $900.37. We have tendered an offer
> of that total amount in settlement to obviate the need
> for all these conferences and further work. That's not
> been accepted today and we've made that offer and we
> renew that offer at this time.

(Id. at 10, l. 24 to 11, l. 5.)  When the court asked plaintiffs'

counsel to respond, his response was as follows:  "Our response

to him is that's not acceptable."  (Id. at 11, l. 8-9.)

The court then met at sidebar with counsel in each of the

individual cases to discuss how each case would proceed.  At the

end of that process, the court invited Bello to join plaintiffs'

counsel at the sidebar for a discussion with the court.  The

court stated the following to Bello and plaintiffs' counsel:

> I just want to make sure that counsel understand the
> implications of some of the things that have come up.
> You're going to have discussions during your settlement
> conference with Judge Martinez about whether the
> plaintiff is exposed to sanctions, and I'm expecting some
> vigorous filings because as things stand, unless there is
> a very good argument on the motion for reconsideration,
> and I really can't conceive of one . . . , you could very
> well find yourself in a case where the amounts of money
> that you got out of settlements with other cases gets
> wiped out if people make compelling arguments for
> sanctions. They are going to ask for costs. They are
> going to ask for attorneys' fees because we're now at a
> situation where what I've told the parties is roughly
> about $900 is what is at stake here.
>
> So I think if you're going to continue, you're going
> to have to have a pretty good argument as to why
> continuing to litigate the case and drive up expenses for
> all the parties for $900 where it's really the same --
> it's really the same amount that you're trying to get
> from each of those parties is not sanctionable conduct.

So I think you ought to do some research on that in advance before you go to the settlement conference because I'm pretty sure Judge Martinez is going to be pressing you for an explanation if that's not -- if your position at that time is that you're going to continue with the case.

(Tr. of End of 1/16/05 Status Conference (Doc. No. --) at 5, l. 25 to 7, l. 3.)

There followed additional discussion about the possibility of settlement, which led to the following statement by plaintiffs' counsel:

MR. UMEUGO: I understand that, Your Honor. What I'm talking about, to try to do that before the settlement conference.

THE COURT: Yes.

MR. UMEUGO: In terms of putting to them, putting out to them the cost of litigating that count that is left to the end and then present it as part of the offer to resolve.

THE COURT: That's your call, but I think what you're exposed to there is a motion for sanctions, but that's your call. I've never had to decide such a motion so I can't tell you how I would look at it.

(Id. at 10, l. 18 to 11, l. 4.)  A moment later, the court stated the following to Bello and plaintiffs' counsel: "But you do have the possibility, if you don't handle this correctly, of having all the money you've recovered in settlement so far wiped out by a sanctions award.  I wanted to make sure you understood that." (Id. at 11, l. 10-13.)  The court then made a comment to the effect that the defendants were "all picking up on it." (Id. at

15

11, l. 15.)  And the response by plaintiffs' counsel was "I understand that."  (Id. at 11, l. 16.)

A moment later, in response to an inquiry as to whether he had any questions, Bello stated that he wanted a judgment for all of the court costs he had incurred and for all the damage that was done to his property and his equipment.  The court explained to Bello that he was only entitled to get what the CERCLA statute allowed him to recover and that his lawyer would have to sit down with him and explain that to him.  The court informed Bello that although it understood what he wanted, he was only entitled to recover what the law allows him to recover.  A moment later, the status conference ended.

As noted above, the plaintiffs had filed federal complaints against a total of 83 defendants pursuant to which they sought recovery of the same monetary damages they were seeking to recover from Barden.  At the time plaintiffs' counsel rejected Barden's third offer to pay his client's water usage fees in the aggregate amount of $900.37 on January 16, 2002, plaintiffs' counsel had already negotiated in excess of ten settlements and recovered settlement funds in an aggregate amount in excess of $52,200.

Immediately after the January 16, 2002 joint status conference ended, plaintiffs' counsel filed an amended complaint

16

against Barden and Winsted, seeking to recover from each the amount of $900.37 for water usage fees.

On January 22, 2002, plaintiffs' counsel made settlement offers to each of Barden and Winsted seeking to obtain from each $900.37 for water usage fees and $2,000 for attorneys' fees and costs.

On January 22, 2002, Barden served notices on the plaintiffs and their counsel that it intended to seek its attorneys' fees and costs as a sanction against them at the conclusion of the litigation because in Barden's view they had engaged in a course of unwarranted, vexatious and oppressive conduct during the course of the litigation. Both notices of intention to seek sanctions were also filed with the court.

January 24, 2002 had been reserved for a hearing on any motion for reconsideration filed by the plaintiffs in response to the court's rulings on the motions to dismiss, and a status conference was held at that time in this case. In response to an inquiry from the court, plaintiffs' counsel represented that he had decided not to pursue a motion for reconsideration "in light of the court's position that each or all the parties should try to resolve this case in an amicable fashion," (Tr. of 1/24/02 Status Conference (Doc. No. 39) at 2, ll. 22-24.). However, the fact is that the plaintiffs never had a good-faith basis for filing any motion for reconsideration.

17

Also, the court inquired of plaintiffs' counsel as to whether he had received a copy of the notices of intent to seek sanctions. In response, plaintiffs' counsel stated "we also will seek sanctions and costs against the defendant, against the lawyer representing the defendant as well as the defendants in question before the Court today," (Id. at 4, ll. 20-23), even though there was no good faith basis for the filing by the plaintiffs of a motion for sanctions.

The court confirmed with counsel for Barden that, when he made the settlement offer of $900.37 on January 16, the offer was made solely on behalf of Barden. The court then turned to plaintiffs' counsel and made the point that if the cases were to proceed further, what was at issue would only be the $900.37 and defendants in the various actions would be jointly liable for that amount were the plaintiffs to prevail. At that point, plaintiffs' counsel stated that he had not previously understood that the offer of $900.37 was from just Barden and if the offer was from just Barden, then the plaintiffs were willing to accept it. There then followed a discussion between the court and counsel for Barden during which counsel for Barden argued that if the plaintiffs had recovered $900.37 from any defendant in any case, then the plaintiffs no longer had any claim in this case, and the court expressed a concern about having an adequate basis for making a finding that what had been obtained by the

plaintiffs pursuant to the settlements in other cases included
the $900.37 for water usage fees.

Counsel for Barden then offered a payment of $900.37 on
behalf of Barden, Winsted, Howard and Mattatuck, and it was clear
that the amount being offered related only the $900.37 in water
usage fees.  At that point, the court stated that the cases as to
Barden and the three companies with which it was conducting a
joint defense would be dismissed.

Counsel for Howmet Corp.-Turbine Components Corp. and
Westvaco then noted that because the plaintiffs had been made
whole as to their only remaining claims against those companies,
the cases[1] against her clients should be dismissed because they
were now moot.  The following exchange occurred between the court
and plaintiffs' counsel:

> MR. UMEUGO: Your Honor, the one that settled was
> against four defendants.  This particular defendant was
> not represented in part of the original four that
> resolved the matter.  It's between this plaintiff and
> the other defendants.

> THE COURT: Well --

> MR. UMEUGO: To see how they are going to benefit
> from --

> THE COURT: Let me ask you this question, which is
> prompted by Attorney Whitney's comments: It was my
> understanding that when we had the settlement with respect
> to the other first four defendants with Mr. Wellington's

---

[1] <u>Bello v. Jarvis Airfoil</u>, 3:01cv01671, and <u>Bello v.
Grodel's</u>, 3:01cv01925, respectively.

clients that the $900.37 was the water usage fees.  That's
what it represented?

     MR. UMEUGO: I don't know, Your Honor.

(<u>Id.</u> at 15, ll. 4-18.)  The court could not credit the statement
by plaintiffs' counsel that he did not know that the $900.37
offered on behalf of Barden, Winsted, Howard and Mattatuck was
for the water usage fees; plaintiffs' counsel provided no other
explanation for his refusal to agree at that point that the other
cases were moot.  It was only after the court made it clear that
it had concluded the other cases were moot that plaintiffs'
counsel agreed to go along with this outcome.  It was apparent
from his performance during the course of the January 24 status
conference that had plaintiffs' counsel been allowed to do so, he
would have attempted to extract at least the $900.37 for the
water usage fees from each of the defendants remaining in the
other cases he had filed.

    The January 24, 2002 conference ended with the court
dismissing the claims against the remaining defendants named in
all of the related actions.

## II.  <u>Discussion</u>

    Barden has moved (i) for imposition of sanctions against the
plaintiffs and their counsel, Attorney Ikechukwu Umeugo, pursuant
to the court's inherent power to impose sanctions for improper
conduct during the course of litigation, and (ii) in the
alternative, for imposition of sanctions against plaintiffs

counsel pursuant to Rule 11(b) of the Federal Rules of Civil
Procedure, Local Rule of Civil Procedure 16(g)(1)(formerly Local
Rule of Civil Procedure 31(a)) and/or 28 U.S.C. § 1927.

When there is bad-faith conduct during the course of
litigation that could be adequately sanctioned under either a
statute or a procedural rule, the court should ordinarily rely on
the statute or rule rather than on its inherent power. Chambers
v. Nasco, Inc., 501 U.S. 32, 50 (1991). However, where conduct
that is otherwise sanctionable under a statute and/or one or more
procedural rules is intertwined with conduct that can only be
reached by means of the court's inherent power, the court may, in
its discretion, rely on its inherent power to impose sanctions
for the entire course of conduct. See id. at 51. Likewise, when
a court would be required to rely upon several different
authorities to reach individual actions within a course of bad-
faith conduct, it may rely upon its inherent power to reach all
the actions constituting that bad-faith conduct. See id. at 51
("In circumstances such as these in which all of the litigant's
conduct is deemed sanctionable, requiring a court first to apply
Rules and statutes containing sanctioning provisions to discrete
occurrences before invoking inherent power to address remaining
instances of sanctionable conduct would serve only to foster
extensive and needless satellite litigation, which is contrary to
the aim of the Rules themselves.").

21

Here, because of the limitations on who may be sanctioned as well as what type of conduct is sanctionable under Rule 11 of the Federal Rules of Civil Procedure,[2] Local Rule of Civil Procedure 16(g)(1)[3] and 28 U.S.C. § 1927,[4] and because the court has concluded that the imposition of sanctions against both the plaintiffs and their counsel is appropriate, the court has concluded it is most appropriate to impose sanctions pursuant to its inherent power.

The court has inherent power to sanction the improper conduct of both attorneys and their clients. <u>Oliveri v. Thompson</u>, 803 F.2d 1265, 1272 (2d Cir. 1986). This inherent power may be used to reach the conduct of a client when that client acts in concert with his or its attorney to carry out an

---

[2] Under Rule 11, the court may only impose sanctions for conduct relating to the signing and filing of papers with the court. The plaintiffs did not sign any of the papers filed in this case. Also, monetary sanctions may not be imposed on a represented party for violation of Rule 11 (b)(2). <u>See</u> Fed. R. Civ. P. 11 (c)(2)(A).

[3] Local Rule of Civil Procedure 16 (g)(1) provides that the court may impose sanctions "directly against counsel who . . . intentionally obstruct the effective and efficient administration of justice." D. Conn. L. Civ. R. 16 (g)(1). Thus, this local rule does not provide for the imposition of sanctions against the plaintiffs.

[4] Section 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C.A. § 1927 (2005). Thus, § 1927 also does not provide for the imposition of sanctions against the plaintiffs.

improper course of conduct.  See generally Chambers, 501 U.S. at
32-58 (client assessed attorneys' fees and costs for the entire
litigation and his attorneys were disbarred or suspended).

A sanction may be imposed under the court's inherent power
either for "commencing or for continuing an action in bad faith,
vexatiously, wantonly, or for oppressive reasons."  Oliveri, 803
F.2d at 1272.  A particularized finding of bad faith is required
before a court can impose sanctions pursuant to its inherent
power.  See United States v. International Brotherhood of
Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-
CIO, 948 F.2d 1338, 1345 (2d Cir. 1991)(requiring clear evidence
that the challenged actions are entirely without color, that they
are taken for reasons of harassment, delay or other improper
purpose and requiring a high degree of specificity in the factual
findings).  In reaching its conclusions, the court may take into
consideration related bad-faith conduct engaged in prior to the
commencement of the litigation.  Sussman v. Bank of Israel, 56
F.3d 450, 459 (2d Cir. 1995)("While Rule 11 extends only to
papers filed with the court, the court's inherent power is
broader and would permit the court to impose sanctions on the
basis of related bad-faith conduct prior to the commencement of
the litigation.").  In determining whether there is an overall
pattern of bad-faith conduct, the court may also take judicial

notice of similar actions filed in other courts.  See Elster v. Alexander, 122 F.R.D. 593, 602-05 (N.D. Georgia 1988).

Here, the court concludes that plaintiffs' counsel should be sanctioned for commencing and continuing an action in bad faith, vexatiously, wantonly and for oppressive reasons.  The court has concluded that plaintiffs' counsel pursued the action against Barden, and the companies with which it conducted a joint defense, as part of a course of conduct calculated to harass defendants in the lawsuits he filed in federal court into settlement for the nuisance value of the litigation rather than incurring the full costs of a defense, as opposed to entering into settlements as a means to resolve an honest dispute.  The court has reached this conclusion as to plaintiffs' counsel for a combination of reasons, discussed below.

First, plaintiffs' counsel knew from his experience with the cases filed in Connecticut Superior Court that the claims the plaintiffs made in state court, and then reasserted in federal court, were ones that most likely could be consolidated into a single lawsuit.  There had been a motion to consolidate the seven separate actions filed in Connecticut Superior Court once the cases were transferred to the complex litigation docket.  Notwithstanding the fact that plaintiffs' counsel knew that the claims against all the defendants in the lawsuits could be

24

brought in one lawsuit, he incurred on behalf of the plaintiffs the substantial expense of paying numerous separate filing fees.

When Barden pointed to the filing of separate lawsuits as evidence of improper motivation on the part of the plaintiffs and their counsel, plaintiffs' counsel responded in part that "it was due to the fact that some defendants with lower volumes may have been disadvantaged by being classed with defendants with larger volumes of hazardous waste and/or waste materials." (Pls.' Opp'n (Doc. No. 55) at 16.) However, the pattern of filings does not reflect any such attempt to avoid what the plaintiffs seek to characterize as a disadvantage to defendants.

Howard was one of four defendants named in Case No. 3:01CV01665. The volumes attributed to Howard was 66,186 gallons, but the volume attributed to defendants in that case ranged from 54,277 to 66,700 gallons. The plaintiffs alleged that Mattatuck was responsible for 63,040 gallons, but Mattatuck was not included in the same lawsuit as Howard; rather it was named in Case No. 3:01CV01673.

Mattatuck was one of five defendants named in the lawsuit filed against it. The volumes attributed to those defendants ranged from 61,160 gallons to 81,366 gallons. Thus, the plaintiffs attributed to defendants named in the two lawsuits in which Howard and Mattatuck were named defendants volumes that ranged from 54,277 gallons to 81,366 gallons. There were at

least five additional defendants the plaintiffs contended were responsible for volumes of hazardous waste and/or waste materials that fell within this range.  One, Hartford Compressors (78,984 gallons), was named in the same lawsuit as Mattatuck.  The other four were named in four different lawsuits: (i) Case No. 3:01CV01669, naming Tank Service (57,590 gallons); (ii) Case No. 3:01cv1540, naming Main Brothers Oil Company (72,876 gallons); (iii) Case No. 3:01CV01535, naming Southern New England Telephone Company (61,221 gallons); (iv) Case No. 3:01CV01533, naming FM Precision Golf Manufacturing Corporation (56,855 gallons).

Looking at Winsted, which was named as the defendant in Case No. 3:01CV01541, the plaintiffs alleged that it was responsible for 142,699 gallons of hazardous waste and/or waste materials. However, Sandvik Milford Corporation was responsible for 158,875 gallons, and it was named a defendant in Case No. 3:01CV01536.

Then as to Barden, the plaintiffs alleged that Barden was responsible for 587,668 gallons of hazardous waste and/or waste materials, but it was named in a separate complaint from Kanthal Corporation (552,362 gallons), which was named a defendant in Case No. 3:01CV01539.

Thus it is apparent that there was no attempt made by plaintiffs' counsel to group defendants based on the volume of hazardous waste and/or waste materials the plaintiffs contended defendants were responsible for.

Second, plaintiffs' counsel knew, by virtue of the requests to revise that were filed in Connecticut Superior Court, that his claims for negligence and common law intentional and/or reckless conduct were seriously deficient because they failed to allege any duty of care that any of the defendants in the Palladin Group owed the plaintiffs with regard to the management of waste materials at the property. He knew this because he was non-suited not only with respect to the defendants in the Palladin Group but as to a total of 30 defendants who had filed requests to revise. Yet when plaintiffs' counsel filed the complaint against Barden (and the complaints against all the other defendants in the federal lawsuits), he included, as the Second Count, the same claim for common law intentional and/or reckless conduct with the same deficiency in terms of a failure to allege any duty of care that Barden (or any of the defendants named in the federal lawsuits) owed the plaintiffs with regard to the management of waste materials at the property. Even after this deficiency was pointed out to him repeatedly by virtue of Barden's motion to dismiss, by virtue of the discussion at the October 24, 2001 status conference to discuss Barden's pending motion to dismiss, and by virtue of the court's ruling on Barden's motion to dismiss, plaintiffs' counsel persisted in using the possibility that the plaintiffs might pursue this claim further as leverage in his negotiations with defendants in the

27

lawsuits filed in this court, all the while never articulating a theory as to why the claim was not frivolous.

Third, the complaints filed in Connecticut Superior Court included a claim for amounts to pay for release of the EPA lien in the amount of $1,134,000. Plaintiffs' counsel was familiar enough with CERCLA to know that Barden and the other "Settling Defendants" were protected, pursuant to CERCLA § 113 (f)(2), from contribution for matters addressed in their settlement with the EPA. Thus he did not include a claim for contribution in the complaints filed in federal court. However, even assuming arguendo that plaintiffs' counsel was initially unaware of the controlling precedent that made the two CERCLA claims set forth in the First Count of the complaint against Barden ones that failed to state a claim, as of the time plaintiffs' counsel received Barden's motion to dismiss, and the other motions to dismiss that were filed in the related cases in this court, he was fully apprised of the law that governed his claims and made them clearly lacking in merit. Certainly, by the time plaintiffs' counsel received the court's ruling on Barden's motion to dismiss, it was clear to him that the claim for $900.37 for water usage fees which had not been originally asserted in any of the complaints he filed in federal court was the only CERCLA claim not clearly lacking in merit. However, he persisted, until the day the court dismissed all the plaintiffs'

federal lawsuits, in maintaining the posture that he was settling with defendants to eliminate their exposure to the CERCLA claims and what he knew was a meritless claim for common law intentional and/or reckless conduct.

Fourth, plaintiffs' counsel represented to the court at the January 16, 2002 status conference that a motion for reconsideration was being considered "very seriously." When the court pressed plaintiffs' counsel as to what possible grounds there could be for a motion for reconsideration, his response was evasive. Plaintiffs' counsel never identified any good faith basis for the filing of a motion for reconsideration, and the court concludes that plaintiffs' counsel was at that point simply posturing in order to keep alive the threat of continued litigation as leverage in settlement negotiations with defendants in the lawsuits he had filed in federal court.

Fifth, at the January 16, 2002 status conference, just prior to the point in time when the court met with plaintiffs' counsel and Bello at the sidebar, counsel for Barden offered payment of the full $900.37 that was the subject of the claim for water usage fees in order to obviate the need for further work on the case. The court then met at the sidebar with plaintiffs' counsel and Bello; the court pointed out that they would have to give the court a good argument as to why it was not sanctionable conduct for them to continue to litigate the cases and drive up expenses

for defendants when they were trying to collect the same $900.37 from all the defendants who were left.  The court advised them that plaintiffs' counsel ought to do some research and also made the point that unless plaintiffs' counsel had a very good argument on a motion for reconsideration, a sanctions award by the court could exceed the amount paid by defendants who had settled.

Plaintiffs' counsel then made it clear that his strategy was to use as leverage against each defendant the expense of litigating to the end the $900.37 claim for water usage fees.  At that point, the court informed plaintiffs' counsel that it was "his call" but that there was exposure to a motion for sanctions; and the court also reminded plaintiffs' counsel that if he did not handle the situation correctly, all the money that had been received pursuant to settlements so far could be "wiped out by a sanctions award".  (Tr. of End of 1/16/05 Status Conf. at 11-12.) Thus, this exchange included an explicit statement by plaintiffs' counsel that he was planning to use the nuisance value of continued litigation as leverage in his settlement negotiations, and an explicit warning by the court to plaintiffs' counsel and Bello that there was exposure to sanctions if such a course of conduct was pursued unless plaintiffs' counsel presented a very good argument in a motion for reconsideration of the court's ruling granting the motion to dismiss.

As stated above, plaintiffs' counsel never filed any motion for reconsideration and never articulated at any time, even in opposition to the motions for sanctions, a good faith basis for filing a motion for reconsideration.

Then, on January 22, 2002, plaintiffs' counsel followed through on the plan he had articulated at the sidebar on January 16, making settlement offers to each of Barden and Winsted and seeking to obtain from each of them $900.37 for water usage fees and $2,000 for attorneys' fees and costs.

Sixth, the response of plaintiffs' counsel at the January 24, 2002 status conference, when the court inquired as to whether he had received a copy of Barden's notice of intent to seek sanctions, was also telling.  Plaintiffs' counsel immediately responded that the plaintiffs would also seek sanctions and costs against Barden and Barden's counsel and the "defendants in question before the Court today."  (Tr. of 1/24/04 Status Conf. at 4, ll. 20-23.)  This statement by plaintiffs' counsel was clearly made in bad faith, as there was no possible basis for the filing by the plaintiffs of a motion for sanctions. In addition, this statement by plaintiffs' counsel was an indication of the degree of willfulness with which he was proceeding.  Having been cautioned by the court at the previous conference about being exposed to sanctions, plaintiffs' counsel chose not to discontinue his unreasonable tactics.  Instead, he

decided to deter the filing by Barden of a motion for sanctions by threatening Barden and its counsel with the prospect of a clearly frivolous counter-motion, which, obviously, would have resulted in further litigation expense to Barden.

Seventh, the conduct of plaintiffs' counsel at the hearing on January 24, 2002 demonstrated that he was trying to use the fact that he had filed separate lawsuits against defendants to collect the $900.37 for water usage fees, which was the total they owed jointly, from each of them separately.  His comment that he was willing to accept $900.37 if the offer was just from Barden, as opposed to Barden, Winsted, Howard, and Mattatuck, reflected this fact.  His response to the point made by counsel for Howmet Corp. - Turbine Components Corp. and Westvaco, i.e. that they should not benefit from the payment by other defendants of the $900.37 in water usage fees, also reflected this fact. Finally, his subsequent untrue representation to the court that he did not know whether the $900.37 offered by Barden's counsel was for the water usage fees showed that it was the goal of plaintiffs' counsel to the very end of the case to use whatever means he could to extract from multiple defendants payment for the same claim.

Looking at this combination of factors, the court concludes that plaintiffs' counsel had as his objective harassing Barden and the other defendants in the lawsuits filed in this court into

32

settlement for the nuisance value of the litigation, and thus acted in bad faith.

As to Bello, the court concludes that he should be sanctioned for continuing an action in bad faith, vexatiously, wantonly and for oppressive reasons with respect to all periods after the court's discussion at sidebar with Bello and plaintiffs' counsel on January 16, 2002.

Bello is a general partner in Vera Associates. Thus, he acted on behalf of both himself and Vera Associates in this action. It is difficult to discern what Bello's motivations were and what he thought was going on in the various cases in the state and federal courts prior to the sidebar conference the court held with Bello and plaintiffs' counsel on January 16, 2002. It is not clear to what extent, if at all, Bello was involved in developing and/or approving the litigation strategy prior to that time, and it is also unclear to what extent plaintiffs' counsel consulted with Bello prior to making decisions. The court observed that when plaintiffs' counsel rejected Barden's settlement offer of $900.37 on January 16, 2002, declaring it unacceptable, he did so without consulting with his client, who was seated in the courtroom at the time.

However, as of the time the court concluded the sidebar discussion with Bello and plaintiffs' counsel on January 16, 2002, the conduct of plaintiffs' counsel had been described to

33

Bello as driving up expenses for all the defendants when the plaintiffs were trying to collect from all of them the same $900.37 and Barden had just offered to pay the $900.37. Furthermore, Bello heard the court state that the plaintiffs would have to come up with a good argument as to why their conduct was not sanctionable conduct, and he also heard the court state that the plaintiffs could find themselves in a situation where the amount of money they obtained pursuant to settlements with other defendants was wiped out by sanctions imposed by the court. Also, Bello was informed by the court that he was only entitled to recover what the law allowed him to recover and that his lawyer would have to explain the situation to him.

At this point, Bello should have been concerned about how the plaintiffs could face the possibility of losing all the money they had obtained through settlements as a result of a motion for sanctions. Instead, however, when Bello was asked whether he had any questions, the only point made by Bello was that he wanted a judgment for all the court costs he had incurred and for all the damage that had been done to his property and equipment.

At the conclusion of the discussion at sidebar, Bello had to understand that the plaintiffs were suing multiple defendants in multiple actions for a grand total of $900.37 and requiring those defendants to incur attorneys' fees to litigate the cases, as opposed to simply accepting Barden's offer of $900.37. Whether

or not Bello sat down and got a detailed explanation from plaintiffs' counsel, the plaintiffs were aware, by virtue of the fact that the court informed Bello that substantial sanctions could be imposed, that the tactics being used by plaintiffs' counsel were highly questionable. Notwithstanding these facts, Bello permitted plaintiffs' counsel to continue, on behalf of the plaintiffs, harassing defendants in the lawsuits filed in this court into settlement based on the nuisance value of the litigations. That the plaintiffs did nothing to reign their counsel in was evidenced by the conduct of plaintiffs' counsel at the January 24, 2002 status conference.

## III. **Conclusion**

For the reasons set forth above, Barden Corporation's Motion for the Imposition of Sanctions on Attorney Ikechukwu Umeugo and on the Plaintiffs for Bad Faith Litigation Conduct (Doc. No. 40) is hereby GRANTED. Barden shall file an application for attorney's fees and costs, which shall identify which portion was incurred after the court's January 16, 2002 discussion at sidebar with Bello and plaintiffs' counsel. Thereafter, the plaintiffs and plaintiffs' counsel shall have 21 days in which to file any objections to Barden's application.

It is so ordered.

35

Dated this 29th day of September 2006 at Hartford, Connecticut.


                              _____/s/AWT_____
                              Alvin W. Thompson
                         United States District Judge