UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - - -
RALPH BELLO AND VERA ASSOCIATES    :
LIMITED PARTNERSHIP,               :
                                   :
              Plaintiffs,          :
                                   :
        v                          :     3:01cv01531 (AWT)
                                   :
BARDEN CORPORATION,                :
                                   :
              Defendant.           :
- - - - - - - - - - - - - - - - - -
```

### RULING ON MOTION FOR SANCTIONS

Defendant Barden Corporation ("Barden"), together with Mattatuck Industrial Scrap Metal, Inc. ("Mattatuck"), Winsted Precision Ball Company, Inc. ("Winsted"), and Howard Engineering Company ("Howard"), all represented by the law firm of Carmody and Torrance, mounted a joint defense to certain claims brought by the plaintiffs, Ralph Bello ("Bello") and Vera Associates Limited Partnership ("Vera Associates") in this action and three related cases filed in this court. Barden has moved for sanctions against Bello and Vera Associates and their counsel. For the reasons set forth below, Barden's motion is being granted.

I.   **Factual Background**

The plaintiffs are the owners of property located at 16-20 Elm Street in West Haven, Connecticut. Between January 9, 1984 and October 31, 1997, the plaintiffs rented this property to Robert Pattison, Sr. and certain corporations owned and/or

controlled by him (collectively, "National Oil Services"). National Oil Services operated a waste oil storage, treatment, transfer, recycling and disposal facility at the property throughout that time.

During the same period, National Oil Services obtained waste oil from numerous companies, including Barden, Mattatuck, Winsted, and Howard. On or about January 8, 1998, there was a spill of hazardous substances that had been stored on the property.

The United States Environmental Protection Agency ("EPA") conducted a cleanup of the property between January 8, 1998 and June 30, 1998, at a cost in excess of $1,134,000. The EPA initiated proceedings under the Comprehensive Environmental Response, Compensation and Liability Act of 1980, 42 U.S.C. §§ 9601 et seq., as amended, ("CERCLA") to recover the costs it incurred in cleaning up the property. On October 1, 1998, the EPA placed a lien on the plaintiffs' property in the amount of $1,134,000.

In or about December of 2000, the plaintiffs filed seven complaints against approximately 59 defendants in Connecticut Superior Court, asserting claims for damages the plaintiffs purportedly incurred as a result of the 1998 EPA cleanup of the property. Originally, each of the complaints was a one-count complaint sounding in negligence. The damages sought by the

plaintiffs were as follows: (i) amounts to pay for release of the EPA lien in the amount of $1,134,000; (ii) property damage in the aggregate amount of $160,105.60; (iii) lost rents in the amount of $360,000; and (iv) undisclosed lost profits from two failed sales of the property.

On March 19, 2001, Palladin Precision Products, Inc. ("Palladin"), Mattatuck and Winsted (the "Palladin Group") filed a request that the plaintiffs revise their state court complaint naming them as defendants (the "Original Palladin Complaint") in 12 different respects. The Eleventh Request to Revise specifically asked the plaintiffs to identify the duty that those defendants purportedly owed the plaintiffs with regard to National Oil Services' management of waste materials at the plaintiffs' property.

On or about March 27, 2001, the plaintiffs requested leave to file an amended complaint as to the Palladin Group (the "Amended Palladin Complaint"). The proposed Amended Palladin Complaint contained three counts pursuant to which the plaintiffs sought the same recovery sought in the Original Palladin Complaint. The First Count in the proposed Amended Palladin Complaint alleged common law negligence, but it failed to allege any duty of care that any of the defendants in the Palladin Group owed the plaintiffs with regard to the management of waste materials at the property. The Second Count in the proposed

3

Amended Palladin Complaint was brought under Sections 107 and 113 of CERCLA. The Third Count in the proposed Amended Palladin Complaint alleged common law intentional and/or reckless conduct, but it also failed to allege any duty of care that any of the defendants in the Palladin Group owed the plaintiffs with regard to the management of waste materials at the property.

In April of 2001, the Palladin Group objected to the plaintiffs' request for leave to file the Amended Palladin Complaint on the ground that the plaintiffs had failed to respond to the pending requests to revise. The Palladin Group also objected to the CERCLA claim the plaintiffs sought to bring in the proposed Amended Paladin Complaint on the ground that the Connecticut Superior Court did not have subject matter jurisdiction over that claim.

During May 2001, plaintiffs' counsel made settlement offers to Palladin, Mattatuck, Winsted, BMI and Royal Screw Machine as to his clients' pending state claims. The plaintiffs' state court settlement offers were as follows: Palladin ($4,500), Mattatuck ($6,981), Winsted ($14,269.90), Royal Screw Machine ($5,000) and BMI ($1,000). The plaintiffs' counsel also made a settlement offer to Barden in the amount of $58,766.80 even though the plaintiffs had not filed an action against Barden in Superior Court. The plaintiffs' counsel was able to induce some defendants to settle his clients' negligence claims, which were

4

identical to the negligence claims that had been brought in the Original Palladin Complaint.

The plaintiffs's seven state court complaints were transferred to the Connecticut Superior Court's complex litigation docket, where a motion was made to consolidate the seven actions. On June 29, 2001, the plaintiffs filed a revised complaint against the Palladin Group (the "Revised Palladin Complaint"), in which they asserted a single negligence claim against each of the seven defendants named therein in a separate count for each defendant, including Palladin, Mattatuck and Winsted.

A hearing on the plaintiffs' request for leave to file the Amended Palladin Complaint and several motions by the defendants for nonsuit was held on June 29, 2001. At the time of the June 29, 2001 hearing, the Original Palladin Complaint, the plaintiffs' motion for leave to file the Amended Palladin Complaint, and the Revised Palladin Complaint were all pending before the Superior Court. The Superior Court denied the plaintiffs' request for leave to amend their complaints because the revised complaints filed by the plaintiffs were not responsive to the pending requests to revise. The Superior Court entered a nonsuit as to the plaintiffs' claims as to each defendant who had filed a request to revise. The nonsuit was a final judgment pursuant to which the plaintiffs had four months

5

to move to reopen their case. The Superior Court thereafter issued written orders entering nonsuit as to 30 defendants who had filed requests to revise, including Palladin, Mattatuck and Winsted.

On July 31, 2001, the plaintiffs filed a complaint in this court naming a single defendant. See Bello v. Warner Lambert Co., Docket No. 3:01CV01436. Thereafter, on August 14, 2001, the plaintiffs filed 23 complaints in this court, each of which also named only a single defendant. Barden and Winsted were named in complaints filed on August 14, 2001. The claims against Barden and Winsted were identical.

The First Count of the plaintiffs' federal court complaint against Barden was brought under CERCLA, 42 U.S.C. §§ 9607 and 9613. The Second Count asserted a state law claim for "intentional and/or reckless" conduct. In their complaint, the plaintiffs sought the following amounts as damages for the following injuries or losses: (i) $125,910 for damage to an Abcor system; (ii) $34,195.60 for damage to oil tanks; (iii) $420,000 as damages for loss of rental income; (iv) an unspecified amount as damages in connection with two failed attempts to sell the property for $1,750,000; (v) $2,680 as damages for costs to be incurred in the future in connection with the cleanup of debris left on the property at the end of the EPA cleanup; (vi) $12,000 as damages for costs to be incurred in the future in connection

with testing the pressure in the oil tanks; and (vii) $1,150 as damages for investigatory costs incurred to determine the extent of hazardous materials on the property.

The EPA filed two lawsuits in this court to recover costs the EPA incurred to perform the cleanup of the plaintiffs' property. On August 17, 2001, the EPA sued, inter alia, Bello and Vera Associates to recover those cleanup costs.

Also on August 17, 2001, the EPA commenced an action against Barden and some 400 other parties that had disposed of or arranged for the disposal of hazardous substances at the property through National Oil Services, seeking to recover its response costs under CERCLA. Many of the defendants in that action, including Barden, Winsted, Howard and Mattatuck, promptly accepted the EPA's settlement offer and agreed to pay their share of the agency's response costs. On September 14, 2001, a consent decree (the "Consent Decree") memorializing the settlement was lodged with the court. See United States of America v. A-1 Auto Service, Inc. et al., Docket no. 3:01CV01567 (AHN) (D. Conn.). Notice of the Consent Decree was published in the Federal Register on October 4, 2001, and on December 19, 2001, the EPA filed a motion to enter the consent decree.

Paragraph 20 of the Consent Decree states, in relevant part, that:

> The Parties agree, and by entering this
> Consent Decree this Court finds, that Settling

7

> Defendants and the Settling Federal Agencies are entitled, as of the Effective Date of this Consent Decree, to protection from contribution actions or claims as provided by Section 113(f)(2) of CERCLA, 42 U.S.C. § 9613(f)(2), for "matters addressed" in this Consent Decree. The "matters addressed" in this Consent Decree are Past Response Costs.

(Doc. 16, Ex. C at 7.) The definitions section of the Consent Decree provides that "Past Response Costs" shall mean "all costs, including but not limited to direct and indirect costs, that EPA or DOJ on behalf of EPA has paid at or in connection with the site through May 15, 2001, plus accrued Interest on all such costs through such date." Id. at 2.

Thus, it was clear that once the Consent Decree was entered, Barden and the other "Settling Defendants" would have protection, pursuant to CERCLA § 113(f)(2), from contribution for matters addressed in the settlement.

On or about August 29, 2001, after the EPA had commenced its two actions in this court but before the lodging of the Consent Decree, the plaintiffs filed nine additional complaints in this court, naming a total of 41 additional defendants, including Howard and Mattatuck. The claims against Howard and Mattatuck were identical to the plaintiffs' claims against Barden and Winsted. In addition, the plaintiffs' CERCLA and common law intentional/reckless conduct claims in their federal complaints against Barden, Winsted, Howard and Mattatuck were identical to the plaintiffs' CERCLA and common law intentional/reckless

8

conduct claims in the Amended Palladin Complaint, which had been filed against Mattatuck and Winsted. The law firm of Carmody and Torrance filed separate appearances in this court on behalf of each of Barden and Winsted on September 13, 2001 and on behalf of each of Howard and Mattatuck on October 11, 2001.

On or around October 12, 2001, the plaintiffs filed four additional complaints in this court, naming an additional 18 defendants. The number of defendants named by the plaintiffs in related lawsuits filed in this court totaled 83. The claims were in all material respects identical.

On October 19, 2001, the court held a joint status conference in approximately 34 cases filed by the plaintiffs. In almost every instance, the defendant or defendants in the case were represented at the status conference by counsel. Six of the defendants, including Barden, Winsted and Mattatuck, had filed motions to dismiss. The court decided to select and address first one motion to dismiss, as a method for resolving issues that would dispose of all issues raised in the motions to dismiss that had been filed or were expected to be filed by other defendants. The court selected for this purpose the motion to dismiss that had been filed by Barden.

On October 24, 2001, the court had a conference with plaintiffs' counsel and counsel for Barden to discuss Barden's pending motion to dismiss. During that conference, there was a

9

discussion of Barden's arguments for dismissal of the plaintiffs' claims, and plaintiffs' counsel indicated there might be additional claims under CERCLA that had not been included in the complaint. Plaintiffs' counsel was ordered to identify in the plaintiffs' opposition memorandum any other CERCLA claim the plaintiffs might have, in order to avoid repeated rounds of amended pleadings followed by additional motions to dismiss.

When the plaintiffs filed their opposition to Barden's motion to dismiss on November 9, 2001, they identified one additional claim under CERCLA, which was a claim for water usage fees in the aggregate amount of $900.37.

On or about October 26, 2001, plaintiffs' counsel extended settlement offers with regard to the plaintiffs' federal claims as follows: Barden ($49,951.78), Winsted ($12,129.42), Howard ($5,625.81) and Mattatuck ($5,358.40). The plaintiffs' written settlement offers advised Barden, Winsted, Howard and Mattatuck that they were being asked to settle the plaintiffs' claims against them for the same amount they had paid to settle the EPA's claims against them. As of October 26, 2001, plaintiffs' counsel was aware or should have been aware that Barden, Winsted, Howard and Mattatuck would be entitled to contribution protection under CERCLA once their settlements with the EPA were approved by the court.

10

In ruling on Barden's motion to dismiss, the court dismissed all the plaintiffs' claims with prejudice because they failed to state a claim for which relief could be granted, but granted the plaintiffs' leave to amend the complaint to include the claim for recovery of $900.37 for water usage fees, which had not been included in the complaint. The court's ruling spelled out in detail the reasons why the plaintiffs' claims should be dismissed with prejudice. The ruling noted that the plaintiffs set forth two claims in the First Count, the first claim being one brought under CERCLA § 107(a), i.e., 42 U.S.C. § 9607(a), and the second being a claim for contribution brought under CERCLA §.113(f)(1), i.e., 42 U.S.C. § 9613(f)(1). As to the first claim under CERCLA, the ruling directed the plaintiffs to authority standing for the proposition that as owners of the property where the release of hazardous materials occurred, the plaintiffs were potentially responsible parties under CERCLA and a potentially responsible party may not bring suit under CERCLA § 107(a). As to the second CERCLA claim, i.e., the claim for contribution, the ruling directed the plaintiffs to authority for the proposition that a private party cannot recover under CERCLA for property damage resulting from a release of hazardous substances, nor for economic losses suffered as a consequence of such a release. As to the claim for investigatory costs, the ruling noted that such

11

costs are recoverable under CERCLA only if they conform to the national contingency plan and also noted that:

> The plaintiffs have not alleged that such investigatory costs conform to the national contingency plan, nor have they indicated in their opposition to the motion to dismiss that they contend that such costs, in fact, conform to that plan. This is so notwithstanding the fact that a prominently featured argument in support of the motion to dismiss is that the plaintiffs failed to allege that the work related to these costs was performed "in a manner consistent with" the national contingency plan.

(Ruling on Mot. to Dismiss (Doc. No. 21) at 16-17.)

As to the Second Count, the ruling pointed out that the claim was barred by the applicable statute of limitations and also that the plaintiffs had failed to allege the requisite elements of the claim. Significantly, the ruling stated that the plaintiffs had failed to allege any facts that would support a finding that Barden owed them any duty of care. (See id. at 24.)

On or about the day the court dismissed the plaintiffs' complaint against Barden, the court dismissed the plaintiffs' claims against the remaining defendants in the related lawsuits pending in this court. The orders dismissing those other claims incorporated by reference the court's analysis in its ruling on Barden's motion to dismiss.

On January 16, 2002, the court held a joint status conference in this case and approximately 22 related cases. Representatives of approximately 18 different law firms were

12

present to represent approximately 30 defendants. At the beginning of the status conference the court noted that it was going to first inquire of plaintiffs' counsel as to how he intended to proceed in light of the rulings that had been issued on the motions to dismiss in several of the cases. When the court asked plaintiffs' counsel whether he was going to file a motion for reconsideration, plaintiffs' counsel replied that doing so was an option that was being considered "very seriously." (Tr. of Beginning of 1/16/05 Status Conference (Doc. No. 38) at 1, 7.) The court inquired whether there was any reason for filing a motion for reconsideration other than the fact that the plaintiffs wished the ruling had been different. Plaintiffs' counsel responded as follows: "I will say - I'll go along with what you stated. I have all the reasons. I'm still exploring and looking into them to see how that would fit into the Motion to Reconsider." (Id. at 7, l. 12-15.) The court then noted that any motion for reconsideration would have to be filed by January 22, 2002. (See id.) No motion for reconsideration was ever filed.

Also, the court noted that in one case a motion for sanctions had been filed. (See id. at 5.)

Then just before the court met at the sidebar with counsel in each of the individual cases, Barden's counsel stated the following:

13

> Your Honor, if I may, it's our understanding that the sole claim remaining for the plaintiff is one for water fees in the amount of $900.37. We have tendered an offer of that total amount in settlement to obviate the need for all these conferences and further work. That's not been accepted today and we've made that offer and we renew that offer at this time.

(Id. at 10, l. 24 to 11, l. 5.) When the court asked plaintiffs' counsel to respond, his response was as follows: "Our response to him is that's not acceptable." (Id. at 11, l. 8-9.)

The court then met at sidebar with counsel in each of the individual cases to discuss how each case would proceed. At the end of that process, the court invited Bello to join plaintiffs' counsel at the sidebar for a discussion with the court. The court stated the following to Bello and plaintiffs' counsel:

> I just want to make sure that counsel understand the implications of some of the things that have come up. You're going to have discussions during your settlement conference with Judge Martinez about whether the plaintiff is exposed to sanctions, and I'm expecting some vigorous filings because as things stand, unless there is a very good argument on the motion for reconsideration, and I really can't conceive of one . . . , you could very well find yourself in a case where the amounts of money that you got out of settlements with other cases gets wiped out if people make compelling arguments for sanctions. They are going to ask for costs. They are going to ask for attorneys' fees because we're now at a situation where what I've told the parties is roughly about $900 is what is at stake here.
>
> So I think if you're going to continue, you're going to have to have a pretty good argument as to why continuing to litigate the case and drive up expenses for all the parties for $900 where it's really the same -- it's really the same amount that you're trying to get from each of those parties is not sanctionable conduct.

14

> So I think you ought to do some research on that in advance before you go to the settlement conference because I'm pretty sure Judge Martinez is going to be pressing you for an explanation if that's not -- if your position at that time is that you're going to continue with the case.

(Tr. of End of 1/16/05 Status Conference (Doc. No. --) at 5, l. 25 to 7, l. 3.)

There followed additional discussion about the possibility of settlement, which led to the following statement by plaintiffs' counsel:

> MR. UMEUGO: I understand that, Your Honor. What I'm talking about, to try to do that before the settlement conference.
>
> THE COURT: Yes.
>
> MR. UMEUGO: In terms of putting to them, putting out to them the cost of litigating that count that is left to the end and then present it as part of the offer to resolve.
>
> THE COURT: That's your call, but I think what you're exposed to there is a motion for sanctions, but that's your call. I've never had to decide such a motion so I can't tell you how I would look at it.

(Id. at 10, l. 18 to 11, l. 4.)  A moment later, the court stated the following to Bello and plaintiffs' counsel: "But you do have the possibility, if you don't handle this correctly, of having all the money you've recovered in settlement so far wiped out by a sanctions award.  I wanted to make sure you understood that." (Id. at 11, l. 10-13.)  The court then made a comment to the effect that the defendants were "all picking up on it." (Id. at

15

11, l. 15.) And the response by plaintiffs' counsel was "I understand that." (Id. at 11, l. 16.)

A moment later, in response to an inquiry as to whether he had any questions, Bello stated that he wanted a judgment for all of the court costs he had incurred and for all the damage that was done to his property and his equipment. The court explained to Bello that he was only entitled to get what the CERCLA statute allowed him to recover and that his lawyer would have to sit down with him and explain that to him. The court informed Bello that although it understood what he wanted, he was only entitled to recover what the law allows him to recover. A moment later, the status conference ended.

As noted above, the plaintiffs had filed federal complaints against a total of 83 defendants pursuant to which they sought recovery of the same monetary damages they were seeking to recover from Barden. At the time plaintiffs' counsel rejected Barden's third offer to pay his client's water usage fees in the aggregate amount of $900.37 on January 16, 2002, plaintiffs' counsel had already negotiated in excess of ten settlements and recovered settlement funds in an aggregate amount in excess of $52,200.

Immediately after the January 16, 2002 joint status conference ended, plaintiffs' counsel filed an amended complaint

16

against Barden and Winsted, seeking to recover from each the amount of $900.37 for water usage fees.

On January 22, 2002, plaintiffs' counsel made settlement offers to each of Barden and Winsted seeking to obtain from each $900.37 for water usage fees and $2,000 for attorneys' fees and costs.

On January 22, 2002, Barden served notices on the plaintiffs and their counsel that it intended to seek its attorneys' fees and costs as a sanction against them at the conclusion of the litigation because in Barden's view they had engaged in a course of unwarranted, vexatious and oppressive conduct during the course of the litigation. Both notices of intention to seek sanctions were also filed with the court.

January 24, 2002 had been reserved for a hearing on any motion for reconsideration filed by the plaintiffs in response to the court's rulings on the motions to dismiss, and a status conference was held at that time in this case. In response to an inquiry from the court, plaintiffs' counsel represented that he had decided not to pursue a motion for reconsideration "in light of the court's position that each or all the parties should try to resolve this case in an amicable fashion," (Tr. of 1/24/02 Status Conference (Doc. No. 39) at 2, ll. 22-24.). However, the fact is that the plaintiffs never had a good-faith basis for filing any motion for reconsideration.

17

Also, the court inquired of plaintiffs' counsel as to whether he had received a copy of the notices of intent to seek sanctions. In response, plaintiffs' counsel stated "we also will seek sanctions and costs against the defendant, against the lawyer representing the defendant as well as the defendants in question before the Court today," (Id. at 4, ll. 20-23), even though there was no good faith basis for the filing by the plaintiffs of a motion for sanctions.

The court confirmed with counsel for Barden that, when he made the settlement offer of $900.37 on January 16, the offer was made solely on behalf of Barden. The court then turned to plaintiffs' counsel and made the point that if the cases were to proceed further, what was at issue would only be the $900.37 and defendants in the various actions would be jointly liable for that amount were the plaintiffs to prevail. At that point, plaintiffs' counsel stated that he had not previously understood that the offer of $900.37 was from just Barden and if the offer was from just Barden, then the plaintiffs were willing to accept it. There then followed a discussion between the court and counsel for Barden during which counsel for Barden argued that if the plaintiffs had recovered $900.37 from any defendant in any case, then the plaintiffs no longer had any claim in this case, and the court expressed a concern about having an adequate basis for making a finding that what had been obtained by the

18