plaintiffs pursuant to the settlements in other cases included the $900.37 for water usage fees.

Counsel for Barden then offered a payment of $900.37 on behalf of Barden, Winsted, Howard and Mattatuck, and it was clear that the amount being offered related only the $900.37 in water usage fees. At that point, the court stated that the cases as to Barden and the three companies with which it was conducting a joint defense would be dismissed.

Counsel for Howmet Corp.-Turbine Components Corp. and Westvaco then noted that because the plaintiffs had been made whole as to their only remaining claims against those companies, the cases[1] against her clients should be dismissed because they were now moot. The following exchange occurred between the court and plaintiffs' counsel:

>       MR. UMEUGO: Your Honor, the one that settled was
> against four defendants. This particular defendant was
> not represented in part of the original four that
> resolved the matter. It's between this plaintiff and
> the other defendants.
>
>       THE COURT: Well --
>
>       MR. UMEUGO: To see how they are going to benefit
> from --
>
>       THE COURT: Let me ask you this question, which is
> prompted by Attorney Whitney's comments: It was my
> understanding that when we had the settlement with respect
> to the other first four defendants with Mr. Wellington's

---

[1] <u>Bello v. Jarvis Airfoil</u>, 3:01cv01671, and <u>Bello v. Grodel's</u>, 3:01cv01925, respectively.

19

> clients that the $900.37 was the water usage fees. That's what it represented?
>
> MR. UMEUGO: I don't know, Your Honor.

(Id. at 15, ll. 4-18.) The court could not credit the statement by plaintiffs' counsel that he did not know that the $900.37 offered on behalf of Barden, Winsted, Howard and Mattatuck was for the water usage fees; plaintiffs' counsel provided no other explanation for his refusal to agree at that point that the other cases were moot. It was only after the court made it clear that it had concluded the other cases were moot that plaintiffs' counsel agreed to go along with this outcome. It was apparent from his performance during the course of the January 24 status conference that had plaintiffs' counsel been allowed to do so, he would have attempted to extract at least the $900.37 for the water usage fees from each of the defendants remaining in the other cases he had filed.

The January 24, 2002 conference ended with the court dismissing the claims against the remaining defendants named in all of the related actions.

## II. Discussion

Barden has moved (i) for imposition of sanctions against the plaintiffs and their counsel, Attorney Ikechukwu Umeugo, pursuant to the court's inherent power to impose sanctions for improper conduct during the course of litigation, and (ii) in the alternative, for imposition of sanctions against plaintiffs

20

counsel pursuant to Rule 11(b) of the Federal Rules of Civil Procedure, Local Rule of Civil Procedure 16(g)(1)(formerly Local Rule of Civil Procedure 31(a)) and/or 28 U.S.C. § 1927.

When there is bad-faith conduct during the course of litigation that could be adequately sanctioned under either a statute or a procedural rule, the court should ordinarily rely on the statute or rule rather than on its inherent power. <u>Chambers v. Nasco, Inc.</u>, 501 U.S. 32, 50 (1991). However, where conduct that is otherwise sanctionable under a statute and/or one or more procedural rules is intertwined with conduct that can only be reached by means of the court's inherent power, the court may, in its discretion, rely on its inherent power to impose sanctions for the entire course of conduct. See <u>id.</u> at 51. Likewise, when a court would be required to rely upon several different authorities to reach individual actions within a course of bad-faith conduct, it may rely upon its inherent power to reach all the actions constituting that bad-faith conduct. See <u>id.</u> at 51 ("In circumstances such as these in which all of the litigant's conduct is deemed sanctionable, requiring a court first to apply Rules and statutes containing sanctioning provisions to discrete occurrences before invoking inherent power to address remaining instances of sanctionable conduct would serve only to foster extensive and needless satellite litigation, which is contrary to the aim of the Rules themselves.").

Here, because of the limitations on who may be sanctioned as well as what type of conduct is sanctionable under Rule 11 of the Federal Rules of Civil Procedure,[2] Local Rule of Civil Procedure 16(g)(1)[3] and 28 U.S.C. § 1927,[4] and because the court has concluded that the imposition of sanctions against both the plaintiffs and their counsel is appropriate, the court has concluded it is most appropriate to impose sanctions pursuant to its inherent power.

The court has inherent power to sanction the improper conduct of both attorneys and their clients. <u>Oliveri v. Thompson</u>, 803 F.2d 1265, 1272 (2d Cir. 1986). This inherent power may be used to reach the conduct of a client when that client acts in concert with his or its attorney to carry out an

---

[2] Under Rule 11, the court may only impose sanctions for conduct relating to the signing and filing of papers with the court. The plaintiffs did not sign any of the papers filed in this case. Also, monetary sanctions may not be imposed on a represented party for violation of Rule 11 (b)(2). <u>See</u> Fed. R. Civ. P. 11 (c)(2)(A).

[3] Local Rule of Civil Procedure 16 (g)(1) provides that the court may impose sanctions "directly against counsel who . . . intentionally obstruct the effective and efficient administration of justice." D. Conn. L. Civ. R. 16 (g)(1). Thus, this local rule does not provide for the imposition of sanctions against the plaintiffs.

[4] Section 1927 provides that any attorney "who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C.A. § 1927 (2005). Thus, § 1927 also does not provide for the imposition of sanctions against the plaintiffs.

22

improper course of conduct. See generally Chambers, 501 U.S. at 32-58 (client assessed attorneys' fees and costs for the entire litigation and his attorneys were disbarred or suspended).

A sanction may be imposed under the court's inherent power either for "commencing or for continuing an action in bad faith, vexatiously, wantonly, or for oppressive reasons." Oliveri, 803 F.2d at 1272. A particularized finding of bad faith is required before a court can impose sanctions pursuant to its inherent power. See United States v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, 948 F.2d 1338, 1345 (2d Cir. 1991)(requiring clear evidence that the challenged actions are entirely without color, that they are taken for reasons of harassment, delay or other improper purpose and requiring a high degree of specificity in the factual findings). In reaching its conclusions, the court may take into consideration related bad-faith conduct engaged in prior to the commencement of the litigation. Sussman v. Bank of Israel, 56 F.3d 450, 459 (2d Cir. 1995)("While Rule 11 extends only to papers filed with the court, the court's inherent power is broader and would permit the court to impose sanctions on the basis of related bad-faith conduct prior to the commencement of the litigation."). In determining whether there is an overall pattern of bad-faith conduct, the court may also take judicial

23

notice of similar actions filed in other courts. See Elster v. Alexander, 122 F.R.D. 593, 602-05 (N.D. Georgia 1988).

Here, the court concludes that plaintiffs' counsel should be sanctioned for commencing and continuing an action in bad faith, vexatiously, wantonly and for oppressive reasons. The court has concluded that plaintiffs' counsel pursued the action against Barden, and the companies with which it conducted a joint defense, as part of a course of conduct calculated to harass defendants in the lawsuits he filed in federal court into settlement for the nuisance value of the litigation rather than incurring the full costs of a defense, as opposed to entering into settlements as a means to resolve an honest dispute. The court has reached this conclusion as to plaintiffs' counsel for a combination of reasons, discussed below.

First, plaintiffs' counsel knew from his experience with the cases filed in Connecticut Superior Court that the claims the plaintiffs made in state court, and then reasserted in federal court, were ones that most likely could be consolidated into a single lawsuit. There had been a motion to consolidate the seven separate actions filed in Connecticut Superior Court once the cases were transferred to the complex litigation docket. Notwithstanding the fact that plaintiffs' counsel knew that the claims against all the defendants in the lawsuits could be

24

brought in one lawsuit, he incurred on behalf of the plaintiffs the substantial expense of paying numerous separate filing fees.

When Barden pointed to the filing of separate lawsuits as evidence of improper motivation on the part of the plaintiffs and their counsel, plaintiffs' counsel responded in part that "it was due to the fact that some defendants with lower volumes may have been disadvantaged by being classed with defendants with larger volumes of hazardous waste and/or waste materials." (Pls.' Opp'n (Doc. No. 55) at 16.) However, the pattern of filings does not reflect any such attempt to avoid what the plaintiffs seek to characterize as a disadvantage to defendants.

Howard was one of four defendants named in Case No. 3:01CV01665. The volumes attributed to Howard was 66,186 gallons, but the volume attributed to defendants in that case ranged from 54,277 to 66,700 gallons. The plaintiffs alleged that Mattatuck was responsible for 63,040 gallons, but Mattatuck was not included in the same lawsuit as Howard; rather it was named in Case No. 3:01CV01673.

Mattatuck was one of five defendants named in the lawsuit filed against it. The volumes attributed to those defendants ranged from 61,160 gallons to 81,366 gallons. Thus, the plaintiffs attributed to defendants named in the two lawsuits in which Howard and Mattatuck were named defendants volumes that ranged from 54,277 gallons to 81,366 gallons. There were at

least five additional defendants the plaintiffs contended were responsible for volumes of hazardous waste and/or waste materials that fell within this range. One, Hartford Compressors (78,984 gallons), was named in the same lawsuit as Mattatuck. The other four were named in four different lawsuits: (i) Case No. 3:01CV01669, naming Tank Service (57,590 gallons); (ii) Case No. 3:01cv1540, naming Main Brothers Oil Company (72,876 gallons); (iii) Case No. 3:01CV01535, naming Southern New England Telephone Company (61,221 gallons); (iv) Case No. 3:01CV01533, naming FM Precision Golf Manufacturing Corporation (56,855 gallons).

Looking at Winsted, which was named as the defendant in Case No. 3:01CV01541, the plaintiffs alleged that it was responsible for 142,699 gallons of hazardous waste and/or waste materials. However, Sandvik Milford Corporation was responsible for 158,875 gallons, and it was named a defendant in Case No. 3:01CV01536.

Then as to Barden, the plaintiffs alleged that Barden was responsible for 587,668 gallons of hazardous waste and/or waste materials, but it was named in a separate complaint from Kanthal Corporation (552,362 gallons), which was named a defendant in Case No. 3:01CV01539.

Thus it is apparent that there was no attempt made by plaintiffs' counsel to group defendants based on the volume of hazardous waste and/or waste materials the plaintiffs contended defendants were responsible for.

26

Second, plaintiffs' counsel knew, by virtue of the requests to revise that were filed in Connecticut Superior Court, that his claims for negligence and common law intentional and/or reckless conduct were seriously deficient because they failed to allege any duty of care that any of the defendants in the Palladin Group owed the plaintiffs with regard to the management of waste materials at the property. He knew this because he was non-suited not only with respect to the defendants in the Palladin Group but as to a total of 30 defendants who had filed requests to revise. Yet when plaintiffs' counsel filed the complaint against Barden (and the complaints against all the other defendants in the federal lawsuits), he included, as the Second Count, the same claim for common law intentional and/or reckless conduct with the same deficiency in terms of a failure to allege any duty of care that Barden (or any of the defendants named in the federal lawsuits) owed the plaintiffs with regard to the management of waste materials at the property. Even after this deficiency was pointed out to him repeatedly by virtue of Barden's motion to dismiss, by virtue of the discussion at the October 24, 2001 status conference to discuss Barden's pending motion to dismiss, and by virtue of the court's ruling on Barden's motion to dismiss, plaintiffs' counsel persisted in using the possibility that the plaintiffs might pursue this claim further as leverage in his negotiations with defendants in the

27

lawsuits filed in this court, all the while never articulating a theory as to why the claim was not frivolous.

Third, the complaints filed in Connecticut Superior Court included a claim for amounts to pay for release of the EPA lien in the amount of $1,134,000. Plaintiffs' counsel was familiar enough with CERCLA to know that Barden and the other "Settling Defendants" were protected, pursuant to CERCLA § 113(f)(2), from contribution for matters addressed in their settlement with the EPA. Thus he did not include a claim for contribution in the complaints filed in federal court. However, even assuming <u>arguendo</u> that plaintiffs' counsel was initially unaware of the controlling precedent that made the two CERCLA claims set forth in the First Count of the complaint against Barden ones that failed to state a claim, as of the time plaintiffs' counsel received Barden's motion to dismiss, and the other motions to dismiss that were filed in the related cases in this court, he was fully apprised of the law that governed his claims and made them clearly lacking in merit. Certainly, by the time plaintiffs' counsel received the court's ruling on Barden's motion to dismiss, it was clear to him that the claim for $900.37 for water usage fees which had not been originally asserted in any of the complaints he filed in federal court was the only CERCLA claim not clearly lacking in merit. However, he persisted, until the day the court dismissed all the plaintiffs'

28

federal lawsuits, in maintaining the posture that he was settling with defendants to eliminate their exposure to the CERCLA claims and what he knew was a meritless claim for common law intentional and/or reckless conduct.

Fourth, plaintiffs' counsel represented to the court at the January 16, 2002 status conference that a motion for reconsideration was being considered "very seriously." When the court pressed plaintiffs' counsel as to what possible grounds there could be for a motion for reconsideration, his response was evasive. Plaintiffs' counsel never identified any good faith basis for the filing of a motion for reconsideration, and the court concludes that plaintiffs' counsel was at that point simply posturing in order to keep alive the threat of continued litigation as leverage in settlement negotiations with defendants in the lawsuits he had filed in federal court.

Fifth, at the January 16, 2002 status conference, just prior to the point in time when the court met with plaintiffs' counsel and Bello at the sidebar, counsel for Barden offered payment of the full $900.37 that was the subject of the claim for water usage fees in order to obviate the need for further work on the case. The court then met at the sidebar with plaintiffs' counsel and Bello; the court pointed out that they would have to give the court a good argument as to why it was not sanctionable conduct for them to continue to litigate the cases and drive up expenses

for defendants when they were trying to collect the same $900.37 from all the defendants who were left. The court advised them that plaintiffs' counsel ought to do some research and also made the point that unless plaintiffs' counsel had a very good argument on a motion for reconsideration, a sanctions award by the court could exceed the amount paid by defendants who had settled.

Plaintiffs' counsel then made it clear that his strategy was to use as leverage against each defendant the expense of litigating to the end the $900.37 claim for water usage fees. At that point, the court informed plaintiffs' counsel that it was "his call" but that there was exposure to a motion for sanctions; and the court also reminded plaintiffs' counsel that if he did not handle the situation correctly, all the money that had been received pursuant to settlements so far could be "wiped out by a sanctions award". (Tr. of End of 1/16/05 Status Conf. at 11-12.) Thus, this exchange included an explicit statement by plaintiffs' counsel that he was planning to use the nuisance value of continued litigation as leverage in his settlement negotiations, and an explicit warning by the court to plaintiffs' counsel and Bello that there was exposure to sanctions if such a course of conduct was pursued unless plaintiffs' counsel presented a very good argument in a motion for reconsideration of the court's ruling granting the motion to dismiss.

As stated above, plaintiffs' counsel never filed any motion for reconsideration and never articulated at any time, even in opposition to the motions for sanctions, a good faith basis for filing a motion for reconsideration.

Then, on January 22, 2002, plaintiffs' counsel followed through on the plan he had articulated at the sidebar on January 16, making settlement offers to each of Barden and Winsted and seeking to obtain from each of them $900.37 for water usage fees and $2,000 for attorneys' fees and costs.

Sixth, the response of plaintiffs' counsel at the January 24, 2002 status conference, when the court inquired as to whether he had received a copy of Barden's notice of intent to seek sanctions, was also telling. Plaintiffs' counsel immediately responded that the plaintiffs would also seek sanctions and costs against Barden and Barden's counsel and the "defendants in question before the Court today." (Tr. of 1/24/04 Status Conf. at 4, ll. 20-23.) This statement by plaintiffs' counsel was clearly made in bad faith, as there was no possible basis for the filing by the plaintiffs of a motion for sanctions. In addition, this statement by plaintiffs' counsel was an indication of the degree of willfulness with which he was proceeding. Having been cautioned by the court at the previous conference about being exposed to sanctions, plaintiffs' counsel chose not to discontinue his unreasonable tactics. Instead, he

31

decided to deter the filing by Barden of a motion for sanctions by threatening Barden and its counsel with the prospect of a clearly frivolous counter-motion, which, obviously, would have resulted in further litigation expense to Barden.

Seventh, the conduct of plaintiffs' counsel at the hearing on January 24, 2002 demonstrated that he was trying to use the fact that he had filed separate lawsuits against defendants to collect the $900.37 for water usage fees, which was the total they owed jointly, from each of them separately. His comment that he was willing to accept $900.37 if the offer was just from Barden, as opposed to Barden, Winsted, Howard, and Mattatuck, reflected this fact. His response to the point made by counsel for Howmet Corp. - Turbine Components Corp. and Westvaco, i.e. that they should not benefit from the payment by other defendants of the $900.37 in water usage fees, also reflected this fact. Finally, his subsequent untrue representation to the court that he did not know whether the $900.37 offered by Barden's counsel was for the water usage fees showed that it was the goal of plaintiffs' counsel to the very end of the case to use whatever means he could to extract from multiple defendants payment for the same claim.

Looking at this combination of factors, the court concludes that plaintiffs' counsel had as his objective harassing Barden and the other defendants in the lawsuits filed in this court into

32

settlement for the nuisance value of the litigation, and thus acted in bad faith.

As to Bello, the court concludes that he should be sanctioned for continuing an action in bad faith, vexatiously, wantonly and for oppressive reasons with respect to all periods after the court's discussion at sidebar with Bello and plaintiffs' counsel on January 16, 2002.

Bello is a general partner in Vera Associates. Thus, he acted on behalf of both himself and Vera Associates in this action. It is difficult to discern what Bello's motivations were and what he thought was going on in the various cases in the state and federal courts prior to the sidebar conference the court held with Bello and plaintiffs' counsel on January 16, 2002. It is not clear to what extent, if at all, Bello was involved in developing and/or approving the litigation strategy prior to that time, and it is also unclear to what extent plaintiffs' counsel consulted with Bello prior to making decisions. The court observed that when plaintiffs' counsel rejected Barden's settlement offer of $900.37 on January 16, 2002, declaring it unacceptable, he did so without consulting with his client, who was seated in the courtroom at the time.

However, as of the time the court concluded the sidebar discussion with Bello and plaintiffs' counsel on January 16, 2002, the conduct of plaintiffs' counsel had been described to

33

Bello as driving up expenses for all the defendants when the plaintiffs were trying to collect from all of them the same $900.37 and Barden had just offered to pay the $900.37. Furthermore, Bello heard the court state that the plaintiffs would have to come up with a good argument as to why their conduct was not sanctionable conduct, and he also heard the court state that the plaintiffs could find themselves in a situation where the amount of money they obtained pursuant to settlements with other defendants was wiped out by sanctions imposed by the court. Also, Bello was informed by the court that he was only entitled to recover what the law allowed him to recover and that his lawyer would have to explain the situation to him.

At this point, Bello should have been concerned about how the plaintiffs could face the possibility of losing all the money they had obtained through settlements as a result of a motion for sanctions. Instead, however, when Bello was asked whether he had any questions, the only point made by Bello was that he wanted a judgment for all the court costs he had incurred and for all the damage that had been done to his property and equipment.

At the conclusion of the discussion at sidebar, Bello had to understand that the plaintiffs were suing multiple defendants in multiple actions for a grand total of $900.37 and requiring those defendants to incur attorneys' fees to litigate the cases, as opposed to simply accepting Barden's offer of $900.37. Whether

34

or not Bello sat down and got a detailed explanation from plaintiffs' counsel, the plaintiffs were aware, by virtue of the fact that the court informed Bello that substantial sanctions could be imposed, that the tactics being used by plaintiffs' counsel were highly questionable. Notwithstanding these facts, Bello permitted plaintiffs' counsel to continue, on behalf of the plaintiffs, harassing defendants in the lawsuits filed in this court into settlement based on the nuisance value of the litigations. That the plaintiffs did nothing to reign their counsel in was evidenced by the conduct of plaintiffs' counsel at the January 24, 2002 status conference.

### III. Conclusion

For the reasons set forth above, Barden Corporation's Motion for the Imposition of Sanctions on Attorney Ikechukwu Umeugo and on the Plaintiffs for Bad Faith Litigation Conduct (Doc. No. 40) is hereby GRANTED. Barden shall file an application for attorney's fees and costs, which shall identify which portion was incurred after the court's January 16, 2002 discussion at sidebar with Bello and plaintiffs' counsel. Thereafter, the plaintiffs and plaintiffs' counsel shall have 21 days in which to file any objections to Barden's application.

It is so ordered.